| .PETTIGREW, J.
In this case, plaintiffs filed a motion to dissolve a writ of sequestration that had previously been issued by the trial court. After hearing testimony and argument on the motion, the trial court denied same, finding that there was no contract of sale between the parties and that defendant owned the truck in question. For the reasons that follow, we affirm.
FACTS AND PROCEDURAL HISTORY
On April 28, 2001, plaintiffs, Todd and Carla Joiner (the “Joiners”) visited an automobile dealership owned and operated by defendant, Bill Hood Ford, Inc. (“Bill Hood”), for the purpose of purchasing a vehicle. After deciding on a 2000 Ford F-350 Pickup Truck, the Joiners indicated their intent to trade in their 1998 Ford Mustang and were offered a gross trade-in allowance of $11,000.00 toward the purchase of the truck. The Joiners agreed to the offer and subsequently signed a contract entitled “RETAIL INSTALLMENT SALES CONTRACT, COMBINATION PROMISSORY NOTE, TRUTH IN LENDING DISCLOSURE STATEMENT AND SECURITY AGREEMENT.” The contract provided for the purchase of the truck at a cash price of $26,908.31, with the understanding that Bill Hood would promptly pay Ford Motor Credit Company the balance owed on the Mustang. The lender that Bill Hood was going to use for this transaction was Hibernia National Bank. However, stamped on the face of the agreement was “SUBJECT TO CREDIT APPROVAL.” After signing the contract, the Joiners left their Mustang as a trade-in and were allowed to take the Ford truck home with them.
Shortly thereafter, an employee of Bill Hood contacted the Joiners and advised *1149 them that Hibernia had rejected the loan, but that a different company would be used to finance the deal. Thereafter, on May 26, 2001, the Joiners returned to Bill Hood and signed a new contract entitled “LOUISIANA SIMPLE INTEREST PROPERTY RETAIL INSTALLMENT CONTRACT,” a second document entitled “RETAIL BUYER’S ORDER/LEASE FORM,” and a final document entitled “VEHICLE APPLICATION” for the Louisiana Department of Public Safety and Corrections, Office of Motor Vehicles. According to these documents, the selling price was listed as $26,855.00. Fairlane Credit |aLLC was going to finance $25,582.36 for the Joiners’ purchase of the truck. Unlike the first contract signed by the Joiners, these documents did not have “SUBJECT TO CREDIT APPROVAL” stamped anywhere on them. However, despite the fact that the Joiners signed these documents on May 26, 2001, neither document was signed by a representative of Bill Hood. Again, the Joiners were allowed to retain possession of the truck, but were advised by a representative of Bill Hood that they would need to provide certain information in connection with their credit application. According to the record, the Joiners never produced the information necessary to complete the deal, in spite of numerous requests by Bill Hood and its representatives. Thereafter, Bill Hood asked the Joiners to return the truck, a request that the Joiners did not honor.
Sometime between the original application for credit on April 28, 2001, and the second one on May 26, 2001, Bill Hood sold the Joiners’ 1998 Mustang to a third party in Baton Rouge. When Bill Hood realized that the transaction with the Joiners was not going to be finalized, the Mustang was reacquired, and the Joiners were advised that it was at the dealership. Before the Mustang was returned to Bill Hood, it was driven approximately four thousand miles. There were also new tires and rims put on the Mustang by Bill Hood.
On August 14, 2001, the Joiners filed the instant suit for damages against Bill Hood seeking damages they suffered as a result of Bill Hood’s tortious conduct. In response, Bill Hood filed an answer, generally denying the allegations of the Joiners’ petition, and a reconventional demand, requesting a rescission of the transaction and a writ of sequestration. The truck was subsequently seized pursuant to a writ of sequestration that was issued without bond and was signed by the trial court on September 6, 2001. A $5,000.00 bond was later posted by Bill Hood on October 17, 2001.
On November 9, 2001, this matter came before the trial court on a motion filed by the Joiners to dissolve the writ of sequestration. After hearing the evidence and arguments from counsel, the trial court denied the motion for dissolution of the writ of sequestration, finding that no contract existed between the Joiners and Bill Hood. A judgment in accordance with the court’s findings was signed on January 22, 2002, | ¿wherein the court ordered that the judgment be deemed final for purposes of appeal. It is from this judgment that the Joiners have appealed, assigning the following specifications of error:
1. The trial court erred when it failed to dissolve a Writ of Sequestration which was obtained prematurely and in improper form as it lacked the required security provided in LA. C.C.P. Article 3501 (i.e. a bond) and the demonstration of a lawful cause.
2. The trial court erred when it failed to find a contract of sale existed and was ratified when, despite the lack of signatures, a buyer signs a contract that is not marked “subject to credit approval” *1150 and relinquishes their vehicle as a trade-in, which was sold to a third party before being offered to be returned in an altered condition.
VALIDITY OF THE WRIT OF SEQUESTRATION (Assignment of Error 1)
In their first assignment of error, the Joiners assert that the writ issued by the trial court on September 6, 2001, was obtained prematurely and was in improper form because it lacked the security required by La.Code Civ. P. art. 3501. We disagree.
The Louisiana Supreme Court has described a writ of sequestration as an “extremely harsh remedy which is only extended where the formalities of the law have been strictly and literally complied with.” Hancock Bank v. Alexander, 256 La. 643, 652, 237 So.2d 669, 672 (1970); Matherne v. Estate of Matherne, 341 So.2d 1254, 1257 (La.App. 1 Cir.1976), writ denied, 343 So.2d 1072 (La.1977). Pursuant to La.Code Civ. P. art. 3501, a writ of sequestration “shall issue only when the nature of the claim and the amount thereof, if any, and the grounds relied upon for the issuance of the writ clearly appear from specific facts shown by the petition verified by, or by the separate affidavit of, the petitioner, his counsel or agent.” Article 3501 further provides that anyone applying for a writ of sequestration “shall furnish security as required by law.”
Louisiana Code of Civil Procedure article 3571 prescribes the grounds for sequestration as follows:
When one claims the ownership or right to possession of property, or a mortgage, security interest, lien, or privilege thereon, he may have the property seized under a writ of sequestration, if it is within the power of the defendant to conceal, dispose of, or waste the property or the revenues therefrom, or remove the property from the parish, during the pendency of the action.
| sWith regard to the security required for a writ of sequestration, La.Code Civ. P. art. 3574 provides that “[a]n applicant for a writ of sequestration shall furnish security for an amount determined by the court to be sufficient to protect the defendant against any damage resulting from a wrongful issuance, unless security is dispensed with by law.” Moreover, under certain circumstances, the court may order sequestration on its own motion. Pursuant to La.Code Civ. P. art. 3573, “[t]he court on its own motion may order the sequestration of property the ownership of which is in dispute without requiring security when one of the parties does not appear to have a better right to possession than the other.” Thus, a trial court may order a sequestration upon finding that ownership over the property is in dispute and that neither party appears to have a better right of possession. A trial court’s exercise of its discretion to order a sequestration on its own motion is given much deference and will not be disturbed absent manifest error. Conway v. Stratton, 434 So.2d 1197, 1200 (La.App. 1 Cir.1983).
In the instant case, Bill Hood filed a reconventional demand on September 4, 2001, requesting that a writ of sequestration issue, without bond, to protect its rights with regard to the 2000 Ford pickup truck in question. The sequestration was issued as prayed for, without bond, by the trial court on September 6, 2001, ordering the Sheriff of Tangipahoa to sequester the truck and hold it subject to further orders of the court. Subsequently, on October 17, 2001, a $5,000.00 bond was posted by Bill Hood as security for the sequestration that was previously issued by the trial court.
In denying the Joiners’ motion to dissolve the writ of sequestration, the trial *1151 court noted that pursuant to Article 3573, the court, on its own motion, could order a sequestration without bond. The court continued indicating that although a bond had been posted in this case, it may not have been necessary based on the evidence presented to the court. The court declined, however, to disturb the bond, stating it would rather the bond remain in case the court’s decision was reversed on appeal and there were damages associated therewith.
The Joiners have cited no authority for their position that the failure to post a bond alone was a fatal defect to the writ of sequestration in this case. Rather, the cases cited |fiby the Joiners in brief were instances where writs of sequestration were dissolved due to a lack of foundation. See, e.g. Hancock Bank v. Alexander, 256 La. 643, 237 So.2d 669 (1970) and Huval Tractor, Inc. v. Journet, 413 So.2d 978 (La.App. 3 Cir.), writ denied, 420 So.2d 446 (La.1982). This is certainly not the case here. Bill Hood’s request for a writ of sequestration was fundamentally sound. The foundation for the sequestration was clearly stated by Bill Hood in its reconven-tional demand as is required by Article 3501 for a valid writ of sequestration.
Based on our review of the evidence before us now, we find no manifest error in the trial court’s decision to maintain the writ of sequestration in this case. The law is clear that “the allowance or disallowance of sequestration is a matter of judicial discretion, likewise the allowance without bond.” J.C. Trahan Drilling Contractor, Inc. v. Sterling, 335 F.2d 65, 66 (5th Cir.1964). See also Ludwig v. Calloway, 191 La. 1000, 1005, 187 So. 4, 5 (1939) (holding that the mere fact that the litigants requested a writ of sequestration had no effect on the validity of the trial court’s order granting the sequestration without bond). In the instant case, we cannot say that the trial court exceeded the wide latitude and discretion afforded it in ordering the sequestration without bond. We find no manifest error, and thus, will not interfere with the trial court’s discretion in this matter. This assignment of error is without merit.
VALIDITY OF THE SALE (Assignment of Error 2)
In assignment of error number two, the Joiners attack the trial court’s finding that there was no contract of sale between the parties. The Joiners contend that the May 26, 2001 contract of sale was a valid contract, as it was not conditioned on financing. Further, the Joiners argue that the contract was ratified when their trade-in was sold by Bill Hood. Following our review of the record, we agree with the trial court’s finding that no contract of sale existed between the Joiners and Bill Hood.
The contract of sale is an agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself. Three circumstances must exist for perfection of the contract: the thing sold, the price, and |7consent. La. Civ.Code art. 2439; Alco Collections, Inc. v. Poirier, 95-2582, p. 5 (La.App. 1 Cir. 9/27/96), 680 So.2d 735, 739, writ denied, 96-2628 (La.12/13/96), 692 So.2d 1067; Evans v. Graves Pontiac-Buick-GMC Truck, Inc., 576 So.2d 1025, 1028 (La.App. 1 Cir.), writ denied, 581 So.2d 687 (La.1991). “A conditional obligation is one dependent on an uncertain event. If the obligation may not be enforced until the uncertain event occurs, the condition is suspensive.” La. Civ.Code art. 1767. The obligation subject to a condition in the instant case is the sale of the 2000 Ford F-350 truck.
At the hearing on November 9, 2001, Eddie Collier, general sales manager of *1152 Bill Hood, testified regarding the events surrounding the transaction with the Joiners. Mr. Collier indicated that when the original credit application — which was signed by the Joiners on April 28, 2001— was denied by Hibernia National Bank, the Joiners were advised that they needed to return to Bill Hood to sign another contract. When asked why it took a month to get the second contract signed, Mr. Collier responded, “It did not take a month. They had another approval the first week of May. The Joiners did not come back in until May 26th.” According to Mr. Collier, Bill Hood had obtained conditional approval for the Joiners’ loan through a sub-prime lender, Fairlane Credit LLC. Mr. Collier maintained that this approval was conditioned upon certain stipulations being satisfied. The Joiners returned to Bill Hood, after hours, on Saturday, May 26, 2001. Mr. Collier testified that two Bill Hood employees, “Allen” and “Wayne,” stayed to finalize the deal with the Joiners. “Allen” was later identified by Mr. Collier as Allen Sanders, finance manager for Bill Hood.
During his testimony concerning the details of this transaction, Mr. Collier was asked to identify a document that was later introduced into evidence, over the objection of counsel for the Joiners, as “Hood # 6.” Mr. Collier described “Hood # 6” as a list prepared by Allen Sanders on May 26, 2001, indicating what documents the Joiners would need to produce in order to get financing through Fairlane Credit LLC. The following colloquy occurred between Mr. Collier and counsel for Bill Hood:
|SQ As a sales manager you’re familiar with records and documents in connection with various deals is that correct?
A Yes.
Q I’m going to show you a document and ask if you can recognize this as a portion of the Joiner record in your file? A This is the document that Allen Sanders wrote down everything that was needed to complete the sale the late night that they were there and wrote on it that they were faxing in on Monday everything else that was needed on there to complete the sale.
Q And that is a regular type of record that you maintain in the course of business isn’t it?
A Oh yes, um-hum.
Q And you see these with some frequency?
A On all sub-prime deals.
[[Image here]]
Q Mr. Collier the document reflects what Mr. and Mrs. Joiner were producing in connection with their Fairlane Credit ap is that right?
A Yes it is.
Q Would you tell the court what the document indicates they were told to furnish?
A Proof of income, proof of residence, mortgage name and phone number, references, and tax returns which would include the Schedule C for POI [proof of income].
Q Now based on your familiarity with the finance aspect of the car deals when you’re dealing with sub-prime customers or lenders is this typical of the type of requirement that you would see based on your experience?
A Yes it is on all of them.
Q Is there anything unusual at all about these requirements?
A No.
Q Is there, as far as your company is concerned is there ever in terms of the company policy if you will, what are your sales people that work for you in *1153 structed to tell customers in terms of their financing requirements?
A What’s required for contract cashing and finalization of the sale.
Q Based on company policy then and based on that document Mr. and Mrs. Joiner would have been told that they had to furnish these documents?
A Yes they would have.
_k- • • •
Q Is there any possibility based on your experience that Mr. and Mrs. Joiner would have obtained financing from Fairlane based on the records that you had available? That they would obtain financing without those documents?
A No it would not.
A review of the documents signed by the Joiners on May 26, 2001, corroborates this testimony by Mr. Collier. On the “RETAIL BUYER’S ORDER/LEASE FORM,” the finance company is listed as Fairlane Credit LLC. Moreover, on the “VEHICLE APPLICATION,” Fairlane Credit LLC is named as the first lienholder. It is clear from the record "that Bill Hood never intended to finance the purchase price of the truck. Rather, approval of the financing in connection with the contract signed on May 26, 2001, was subject to a suspensive condition; i.e., that the Joiners would produce certain information regarding proof of income and proof of residence, a condition that never occurred. Even Mr. Joiner acknowledged that Bill Hood did not finance the purchase of the truck. When asked if he ever made payment to Bill Hood for his truck, he responded: “No sir because I wasn’t going to send them money for something, I mean, they didn’t finance me so there wasn’t no sense in me giving Bill Hood money.”
During their first visit to Bill Hood on April 28, 2001, the Joiners made representations to Bill Hood about their income in order to get financing for the purchase of the truck. When asked how much he told Bill Hood his income was, Mr. Joiner testified, “I put a lot less than what I make because they don’t need to know how much I make.... Yeah. I mean I could have put on there twenty thousand a month.” Bill Hood made this sale with the Joiners relying, in good faith, on the financial information provided by the Joiners. Assuming that the information was correct, Bill Hood knew that financing would not be a problem. However, as is clear from the record, the Joiners never fulfilled their obligation of providing the documents necessary to finalize the financing. The approval of financing by Fairlane Credit LLC was the uncertain event that 'suspended enforcement of the sale in this case. Because the suspensive condition in this case never occurred, the sale is null and void and unenforceable. See Evans, 576 So.2d at 1029. 1m Accordingly, the trial court was correct in its finding that there was no contract between the Joiners and Bill Hood and that Bill Hood still owns the truck in question. This assignment of error lacks merit.[1]
CONCLUSION
For the above and foregoing reasons, the judgment of the trial court is affirmed *1154 in all respects. Costs associated -with this appeal are assessed against plaintiffs-appellants, Todd and Carla Joiner.
AFFIRMED.
FITZSIMMONS, J., concurs and assigns reasons.

. With regard to Bill Hood's sale and later reacquisition of the Joiners’ trade-in, we find, as did the trial court, that this is a separate issue that does not affect the validity of the sequestration. Although we acknowledge that Bill Hood mishandled the transaction involving the trade-in, these actions cannot, in anyway, be equated with ratification of a contract that never existed. The question of whether the Joiners suffered any damages as a result of Bill Hood’s actions with regard to the trade-in remains an issue to be resolved another day.